AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original  ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

**4/4/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

**4/4/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ IV _____ DEPUTY

United States of America

Plaintiff,

v.

JUAN MANUEL CHAVEZ-ROJAS,

Defendant

Case No.  2:25-mj-02041-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Sections | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(C) | Conspiracy to distribute controlled substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s Lyndon Versoza*
_____
*Complainant's signature*

Postal Inspector Lyndon Versoza
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     April 4, 2025
_____

*Patricia Donahue*
_____
*Judge's signature*

City and state:    Los Angeles, California
_____

Patricia A. Donahue, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

Beginning in or before 2021, and continuing through March 31, 2025, in Los Angeles and Orange counties, within the Central District of California, and elsewhere, defendant JUAN MANUEL CHAVEZ-ROJAS conspired with others to knowingly and intentionally distribute mixtures and substances containing detectable amounts of cocaine and N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl ("fentanyl"), both of which are Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

**AFFIDAVIT**

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

I. **TRAINING AND EXPERIENCE**

1.    I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  I have been a federal law enforcement officer since 2002.  Currently, I am assigned as a Money Laundering Specialist for the Contraband Interdiction and Investigations (CI2) North Team for the USPIS Los Angeles Division.  In this capacity I am responsible for investigating criminal violations of money laundering and structuring laws, such as when the services of the United States Postal Service are employed by criminals as part of the means to launder or conceal illicit funds, and/or avoid banking reporting requirements.  I am also one of seven Postal Inspectors in the U.S. currently designated by USPIS as a Subject Matter Expert ("SME") in money laundering investigations.  As a SME, I have spoken at money laundering conferences and provided training to the financial and banking industry and other law enforcement agents. I have also received both formal and informal money laundering training from USPIS

and other government and private agencies.  During my over 20-year career as a Postal Inspector, I have investigated: thieves, burglars, rapists, murderers, armed robbers, prison and street gangs, drug and gun trafficking organizations, and perpetrators of financial violations (including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters).  For approximately five years, prior to investigating money laundering crimes, I was assigned to investigate child exploitation and sex trafficking.  In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally.  In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a U.S. Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the U.S. Department of Homeland Security.  In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counterterrorism and human and drug smuggling operations.

3.    I am familiar with the facts and circumstances

described herein.  This affidavit is based upon my personal
involvement in this investigation, my training and experience,
and information obtained from various law enforcement personnel
and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not
purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

## II. SEEKING COMPLAINT AND DIGITAL DEVICE SEARCH WARRANT

        4.    This affidavit is made in support of a complaint
against and arrest warrant for JUAN MANUEL CHAVEZ-ROJAS
("CHAVEZ") for violations of 21 U.S.C. §§ 846, 841(a)(1)
(Conspiracy to Distribute Controlled Substances).

        5.    This affidavit is also made in support of a search
warrant for evidence of violations of 18 U.S.C. § 1956 (Money
Laundering) and 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to
distribute controlled substances)(the "Target Offenses"), as
described more particularly in attachment B which is
incorporated by reference, for the following digital devices,
both of which belong to and/or were used by CHAVEZ, as described
in attachment A, which is also incorporated by reference

- 3 -

(collectively, the "**SUBJECT TELEPHONES**"):

      a.    Blue Apple iPhone Max held by the Orange County Sheriff's Department under evidence number OS25-011640.5 ("**SUBJECT TELEPHONE 1**"); and

      b.    Blue Apple iPhone held by the Orange County Sheriff's Department under evidence number OS25-011640.6 ("**SUBJECT TELEPHONE 2**").

<u>Summary of Probable Cause</u>

6.    JUAN MANUEL CHAVEZ-ROJAS is a high-level drug trafficker with dual U.S. and Colombian citizenship. He fled to Colombia after law enforcement searched his Tarzana, California, residence on April 4, 2022, recovering four pounds of cocaine and 1.08 pounds of fentanyl pills. CHAVEZ has outstanding warrants in Los Angeles County and Sunrise, Florida, and is under investigation by multiple agencies, including USPIS, DEA, LAPD, and sheriff's departments in Orange County, San Bernardino, and Sunrise Police in Florida.

7.    I have investigated CHAVEZ since 2023 after executing a search warrant on a phone containing encrypted chats discussing laundering millions in drug proceeds through cryptocurrency wallets controlled by the Mexican Cartel. In March 2024, CHAVEZ returned to the U.S., relocating to Florida instead of California. In February 2025, ATF informed me that CHAVEZ attempted to purchase over a dozen rifles, a tactic

- 4 -

commonly used by straw buyers supplying weapons to drug cartels.

8.    On February 14, 2025, Sunrise Police responded to a disturbance at the AC Hotel, where a witness overheard an argument in which a man said, "You fucked up and pointed a gun at me." The investigation revealed CHAVEZ had pointed a gold-slide Glock at a victim over a $2,000 debt. Shortly after, he fled to California. On March 31, 2025, Orange County deputies stopped CHAVEZ in his beige 2019 Toyota Corolla after a records check linked it to this felony warrant. He was arrested, and his vehicle, illegally parked in a fire lane, was searched before it was towed.

9.    Inside the vehicle, deputies recovered a loaded black and gold Glock 26, an extra loaded magazine, a one-kilogram brick of cocaine, and the **SUBJECT TELEPHONES**. After being read his Miranda rights, CHAVEZ waived them and admitted obtaining the cocaine from a person he refused to identify.  He admitted that the cocaine was not for personal use and that he intended to deliver it. He also admitted ownership of the firearm, stating he carried it for protection.

III. PROBABLE CAUSE STATEMENT

A. CHAVEZ HAS BEEN INVOLVED IN MONEY LAUNDERING AT LEAST SINCE 2021

10.  In December 2023, I learned that IRNET investigators

- 5 -

were investigating several targets including CHAVEZ for trafficking drugs and laundering hundreds of thousands of dollars through cryptocurrency.

11.  In 2022, CHAVEZ generated a Currency Transaction Report at JP Morgan Chase Bank when he deposited $98,000 cash into his account there.

12.  From reviewing banking records from Bank of America, I learned that CHAVEZ had suspiciously high cash deposits and receipts from peer-to-peer payments in another account.  For example, between February 2021 and March 2022, CHAVEZ received cash deposits of $95,378.00 and peer-to-peer receipts of $30,745, which he depleted mostly through debit card purchases. In my training and experience, drug traffickers typically conduct their drug deals in cash to leave no record of them. But in order to pay for normal living expenses, they will typically want the ability to pay with a credit or debit card. Accordingly, they often maintain an apparently legitimate bank account into which they deposit a small fraction of their drug proceeds, enabling them to make debit card purchases like ordinary consumers rather than attempting to pay for everything with cash, which might sometimes appear suspicious.

B. SEARCH WARRANT EXECUTED AT THE CHAVEZ RESIDENCE, YIELDING
   SEVERAL KILOS OF DRUGS.

13.  From speaking with investigators and reading their
reports, I know that on May 4, 2022, investigators from the
Inland Regional Narcotics Enforcement Team (IRNET), executed a
state search warrant at 19200 Friar Street, Tarzana, which was
the residence of CHAVEZ.  The basis of their search warrant
included surveillance in which CHAVEZ was observed exchanging
drug money with others who would provide cryptocurrency in
exchange for the drug money.

14.  During the execution of the search, CHAVEZ was home
but invoked his right to remain silent.  Inside the home, IRNET
investigators recovered approximately four pounds of cocaine and
1.08 pounds of fentanyl pills.

C. CHAVEZ FLED TO COLOMBIA AFTER THE SEARCH WARRANT.

15.  In or about December 2023, I spoke with an IRNET
investigator who told me that shortly after the search warrant
was executed at CHAVEZ' residence, CHAVEZ fled.

16.  Around that time, I contacted U.S. Customs and Border
Protection ("CBP") who told me CHAVEZ fled to Colombia. I
learned from CBP that in March, 2024, CHAVEZ returned to the
United States from Colombia, but rather than return California,
he moved to Florida.

- 7 -

D. CHAVEZ ATTEMPTED TO PURCHASE 12 or 13 RIFLES.

17.  In February 2025, I was contacted by the Bureau of
Alcohol Tobacco and Firearms ("ATF") in Florida who learned of
my active investigation into CHAVEZ.  The ATF analyst told me
that ATF started a preliminary investigation into CHAVEZ for
attempting to purchase about 12 or 13 rifles from a Federal
Firearms License Dealer. ATF said that although CHAVEZ got "cold
feet" after being questioned about his intentions, ATF said his
conduct was consistent with drug trafficking organizations who
often use straw-buyers to purchase numerous firearms at a time.
These guns are often exported to other countries to support the
drug trade.

E. CHAVEZ THREATENED A PERSON WITH A GUN, WARRANT ISSUED.

18.  From reading their report, I know on February 14,
2025, Sunrise (Florida) Police Officers responded to a
disturbance report at the AC Hotel in Sunrise, Florida.

19.   Upon arrival, the reporting party (hereinafter "RP-
1"), was contacted in room 232. RP-1 reported hearing a
disturbance between other guests coming from the hallway near
room 235. She stated that she believed the argument involved an
unknown Black female and an unknown Black male. During the
argument, she heard the male say, "You fucked up and pointed a
gun at me." The two individuals then immediately left the

- 8 -

hallway and proceeded to the elevator. Lee did not open her door and only overheard part of the incident.

20.    A male in room 228 spoke briefly with the officer but refused to fully identify himself. He provided the name Josh and a phone number. Josh corroborated RP-1's account and added that he believed the two individuals in the hallway had been arguing with a third person, possibly still inside room 235.

21.    Hotel staff at the AC Hotel confirmed that room 235 was registered to "Juan Chavez," (JUAN MANUEL CHAVEZ-ROJAS), CHAVEZ was contacted via cell phone and granted permission for the hotel manager to open his room so officers could conduct a welfare and safety check. The search of the room yielded no signs of a disturbance or weapons. CHAVEZ stated that he was on his way back to the hotel to explain the situation.

22.    Upon arrival, CHAVEZ was searched for weapons; none were found on his person. He stated that he keeps his firearm locked in his car. Since he was not near the vehicle during questioning, it was not considered an immediate safety concern. A background check revealed that CHAVEZ had no active wants, warrants, or criminal history.

23.    CHAVEZ explained that he was the sole occupant of the hotel room but had invited his cousin, Jacklyne Chaves, to visit. He described her as a white female but was unable to provide additional identifying information. Jacklyne had brought

- 9 -

her boyfriend, an unknown Black male, to visit as well.
According to CHAVEZ, he disapproved of something the boyfriend
said to Jacklyne and told him not to speak that way again. This
led to an argument, after which everyone dispersed. CHAVEZ
denied making any threats, pointing a firearm at anyone, or
being involved in anything beyond a verbal altercation. He
stated that his firearm remained in his car the entire time.

24.  CHAVEZ provided Jacklyne's phone number to officers,
but when an attempt was made to contact her, the line was
disconnected. He did not know her date of birth or any other
means of contacting her. CHAVEZ also stated that he had no
further information about her boyfriend. Since there were no
allegations of a crime at that time, no further questioning was
conducted.

25.  At approximately 10:50 PM, nearly two hours later,
another call was received regarding the case. The caller, later
identified himself (hereinafter "RP-2"), claimed that a firearm
had been pointed at him earlier in room 235. Officer Thomason
met with RP-2 and his girlfriend, Jacklyne Chaves, across the
street from the AC Hotel.

26.  RP-2 reported that CHAVEZ had invited them to his
hotel room to socialize and to discuss an outstanding debt. RP-2
stated that he had borrowed $2,000 from CHAVEZ and intended to
make a partial payment that evening. However, when he informed

CHAVEZ that he could not pay the full amount, CHAVEZ became irate, retrieved a Glock 26 handgun with a gold-colored slide, racked the slide, and pointed it at him while saying, "Don't play with me. I'll kill you, nigga."

27.   RP-2 stated that he then exited the room into the hallway while Jacklyne remained briefly in an attempt to calm CHAVEZ. When she was unsuccessful, she also left. It was during this altercation that RP-2 yelled in the hallway, alerting nearby guests.

28.   RP-2 further explained that he and Jacklyne proceeded to the parking lot, where he had parked his red Honda Civic on the southeast side of the hotel. Shortly thereafter, CHAVEZ ran out of the hotel toward his car, tapped on the window with his gun, and yelled. RP-2 then left the area without further incident. When asked if he feared for his life, RP-2 confirmed that he was afraid CHAVEZ would shoot him.

29.   Despite the incident, RP-2 stated that he still considered CHAVEZ a friend and attempted to call him afterward to resolve the situation. He claimed that he and CHAVEZ argued for an hour over the phone before he decided to call 911. RP-2 expressed his desire to press charges, stating that he believed he would be in legal trouble if he had been the one to display a firearm.

30.   RP-2 described the firearm as a Glock 26 with a gold-

colored slide, which he recognized from previous encounters with CHAVEZ. He completed an affidavit electing to press charges, and sworn recorded statements were obtained from both him and Jacklyne.

31.    During her statement, Jacklyne confirmed that CHAVEZ was her cousin and corroborated RP-2's account of the incident. She stated that the dispute primarily stemmed from CHAVEZ feeling disrespected by RP-2. She also confirmed witnessing the phone conversation between the two men following the altercation.

32.    Officer Thomason returned to the AC Hotel in an attempt to contact CHAVEZ again, but he was not present. A phone call was made to CHAVEZ, who stated that he was at the Seminole Hard Rock Hotel and Casino for the night. He denied any wrongdoing and refused further discussion.

33.    A warrant for CHAVEZ' arrest for Assault with a Deadly Weapon was lodged into the system in or about March 26, 2025.

F.   CHAVEZ FLED TO CALIFORNIA WHERE OFFICERS DISCOVERED HIS FLORIDA WARRANT AND ARRESTED HIM, FINDING DRUGS AND THE GUN.

34.    On March 31, 2025, Orange County Sheriff Deputies in a marked patrol vehicle observed a beige 2019 Toyota Corolla ("CHAVEZ' Vehicle") parked on the south curb of eastbound Santiago Blvd. The deputies conducted a records check of the vehicle's license plate which revealed a felony arrest warrant attached to the license plate.  The warrant was for CHAVEZ and

indicated he was considered armed and dangerous.  Deputies effected a traffic stop on CHAVEZ who was inside the driver seat of the vehicle.  CHAVEZ was placed under arrest for the warrant.

35.  A deputy conducted a records check of CHAVEZ to verify his license status and criminal history. A records check showed he had a felony warrant for his arrest for aggravated assault with a deadly weapon out of Florida with full extradition. CHAVEZ was placed under arrest for his outstanding warrant.

36.  CHAVEZ Vehicle was parked in a no parking zone marked with a red curb indicating a fire lane.  The deputy requested a tow truck and inventoried the contents of the vehicle prior to the tow. Inside the vehicle was a backpack that contained a loaded black and gold Glock 26 (which matched the gun used in the assault in Sunrise, Florida). The deputy removed the magazine from the gun, which had 17 rounds of 9mm ammunition in the magazine and one additional magazine containing an additional 14 rounds.

37.  Also inside the backpack was a vacuum sealed brick of cocaine. The sealed brick of cocaine was later weighed at approximately 1 kilogram, which included packaging.

38.  **SUBJECT TELEPHONE 1** and **SUBJECT TELEPHONE 2** (the **SUBJECT TELEPHONES**) were also found in the backpack.

39.   CHAVEZ was advised of his rights using Orange County Sheriff Department issued Miranda card.  CHAVEZ waived his

rights.  CHAVEZ told the deputies that he obtained the cocaine

from "friend," who he refused to identify.  He acknowledged that

the cocaine was not for personal use and that he had intended to

distribute it.  CHAVEZ also told the deputies he was the

registered owner of the gun and carried it for protection.

40.  CHAVEZ was also placed under arrest for California

state drug trafficking violations.

G. <u>TRAINING AND EXPERIENCE ON COMMUNICATIONS OF CRIMINALS</u>

41.  Based on my experience and training, and based on my

consultation with other law enforcement officers who specialize

in drug and financial crimes, I know that:

a.  Individuals involved in drug trafficking and

money laundering must maintain evidence of their schemes, such

as pay-owe sheets, contact information for their co-

conspirators, and records documenting the movement of criminal

proceeds, just to keep their schemes going.  Nowadays, such

information is mostly typically stored on a digital device, such

as a smart telephone.

b.  Individuals involved in conspiracies need to

communicate with their co-conspirators about their criminal

activity.  There are usually records of those communications in

their electronic devices, such as cellular telephones.

c.  Many criminals attempt to obscure their financial

transactions by the use of cash.  More sophisticated ones use

the banking system, but attempt to disguise criminal proceeds
and transfers as payments for non-existent loans or other
seemingly legitimate dealings, or by having a third party make
the payments on the criminal's behalf.  More recently, it has
become common especially for drug traffickers to use
cryptocurrency to store their wealth and even to make and
receive payments for controlled substances.  Regardless of the
means of payment, it is common for criminals to maintain records
that reflect them on their digital devices.

H. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

42.  As used herein, the term "digital device" includes the
**SUBJECT TELEPHONES**.  Based on my training, experience, and
information from those involved in the forensic examination of
digital devices, I know that the following electronic evidence,
inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

- 16 -

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IV. <u>CONCLUSION</u>

45.    Based on the foregoing, I contend there is probable

cause to believe that CHAVEZ conspired to distribute controlled

substances and that evidence of the Target Offenses will be

found on the **SUBJECT TELEPHONES.**

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this  4th day of April, 2025.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

- 18 -